UNITED STATES

v.

Robert E. MYERS, Jr., 006 68 4039,
Lance Corporal (E–3), U.S.
Marine Corps.

NMCM 97 01307.

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 30 April 1997.

Decided 5 Aug. 1999.

LT Frank M. Doherty, JAGC, USNR, Appellate Defense Counsel.

LT Albert L. Di Giulio, JAGC, USNR, Appellate Defense Counsel.

LT Janice K. O'Grady, JAGC, USNR, Appellate Government Counsel.

Before DORMAN, Senior Judge,
TROIDL, Senior Judge, and ROLPH,
Appellate Military Judge.

ROLPH, Judge:

Officer members, sitting as a general court-martial, convicted the appellant, contrary to his pleas, of three specifications of rape and two specifications of forcible (anal) sodomy in violation of Articles 120 and 125, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 925 (1994).[1] The appellant was sentenced to 9 years confinement, total forfeiture of pay and allowances, reduction to E–1, and a dishonorable discharge. The convening authority approved the sentence as adjudged and, except for the dishonorable discharge, ordered it executed.

We have carefully reviewed the record of trial, the appellant's thirteen assignments of error, and the Government's response. We also gratefully acknowledge the extremely helpful oral arguments presented by appellate counsel. Because we conclude that error materially prejudicial to the appellant's substantial rights was committed when the military judge refused to give a defense requested "spill-over" instruction to the members, we set aside the findings of guilty. Arts. 59(a) and 66(c), UCMJ.

1. The appellant was found not guilty of one specification of kidnapping alleged as a violation of Article 134, UCMJ.

## Facts

The appellant, at the time of these alleged offenses, was assigned to Field Company, Weapons and Field Training Battalion, located at Camp Pendleton, California. He resided in military barracks located in the Edson Range Area on Camp Pendleton. At his vigorously contested general court-martial conducted on various dates between January and May, 1996, the appellant was ultimately convicted of raping and anally sodomizing two separate victims on two separate occasions (approximately five months apart from one another).

The facts surrounding each of the offenses were very much in dispute. Both incidents involved what might be described as "acquaintance rape" scenarios, and the primary issue in each instance was whether or not the alleged victims had consented to the sexual acts they engaged in with the appellant. To properly address the specific legal issues involved in this case, a rather detailed examination of the facts surrounding the two separate incidents involved in this case is required.

### The Incident Involving Corporal [D]

Corporal [D], who was assigned to the same unit as the appellant, claimed that she was raped and forcibly sodomized by the appellant in her barracks room on a Friday or Saturday evening sometime in September 1994. Because Cpl [D] waited over 8 months to report the incident to authorities, she could not remember the specific date.

Cpl [D] testified that she had known the appellant as a casual acquaintance after having first met him at Motor Transport School, and then subsequently being assigned together in the same unit at Camp Pendleton. Cpl [D] testified that, on the date of the alleged offenses involving her, she and the appellant had participated in a unit car wash together, where they engaged in mutual horseplay and some loosely disguised flirting. They also discussed each other's plans in regard to attending an upcoming Marine Corps birthday ball. Record at 666. The appellant later came by her room in their barracks with a friend, Cpl Dustman, and invited Cpl [D] to go to the enlisted club with them. She agreed and, at approximately 2100, she joined a group of Marines at the enlisted club that included the appellant, Cpl Pierson, Cpl Martinez, Cpl Dustman, Cpl Rogers, and others. Cpl [D] testified that she spent approximately three hours at the club, during which she drank four or five glasses of beer. She also stated that she found the appellant to be an "attractive Marine," danced with him on multiple occasions, and kissed him while they were together on the dance floor. Record at 650–51. At approximately midnight, Cpl [D] became tired and expressed her intention to leave. Cpl Pierson and the appellant asked her for a ride back to the barracks, where they all resided. After arriving at the barracks, they all went to Cpl Pierson's room to watch a movie. Cpl [D] testified that she fell asleep on a bed in Pierson's room during the movie, and was later awakened by the appellant, who told her that if she was tired she would have to go to her own room to sleep. According to Cpl [D], the appellant walked her down to the first floor where they parted company after saying goodnight. She then changed into her nightclothes, a tee shirt and boxer shorts; and shortly thereafter heard a knock on her door. It was the appellant. She allowed him in and they began talking. After a short while, they engaged in consensual kissing. As Cpl [D] put it, "he went to kiss me and that was o.k. with me." Record at 655. The appellant then placed his hand up the back of Cpl [D]'s shirt. This made her uncomfortable and she testified that she told the appellant, "no, I don't want to go that far." *Id.* Cpl [D] claimed that the appellant continued to run his hand up into her shirt, and she again told him, "no." The appellant then pushed her back onto her bed, forcibly restrained her, and began removing her clothes. Despite her verbal pleadings and efforts to resist, Cpl [D] claims the appellant raped her and then forcibly sodomized her. She also testified that she "blanked out" during the act of anal intercourse, and when she came to, the appellant was dressing. Record at 662–63. He then left the room. As previously mentioned, Cpl [D] did not report this incident to authorities until May 1995, eight months after it occurred.

Significant discrepancies in Cpl [D]'s version of events were developed at trial. She was unable to recall at trial exactly how much she had to drink that night while at the enlisted club, but admitted saying in her Article 32, UCMJ, testimony she had consumed six beers and felt "buzzed." Record at 668. While admitting to "French kissing" the appellant once while dancing a slow song with him, she denied engaging in "dirty dancing" with him (i.e., "grinding and moving and rubbing" their bodies together). Record at 670. However, others present described the physical contact between her and appellant on the dance floor as erotic, and at times involved Cpl [D] pressing her buttocks into the appellant's groin. Record at 650–51, 670–72, 760, 890, 889–91, and 912–13. Upon their return to the barracks and Cpl Pierson's room to watch a movie, Cpl [D] denied hugging and kissing the appellant while the two of them were together on a bed. However, a Marine present clearly remembers them doing so. Record at 675, 761, and 914. Cpl [D] also denied that the appellant escorted her past the bottom of the barracks stairs later that night, while two eyewitnesses saw her being "piggy-backed" down the stairs and escorted through the lounge toward her room by the appellant. Record at 762, 873–78, 891–92. Despite being close friends at the time, Cpl [D] never told her roommate, Cpl Cole, she had been raped. Indeed, Cpl Cole testified that, at lunch the day after the alleged rape, Cpl [D] talked about having sex with the appellant but never once mentioned the sex as being nonconsensual, "blacking out," or having struggled with the appellant. Cpl Cole's impression was that the sex had been consensual, and that Cpl [D] had tried anal sex and did not like it because "it hurt." Record at 817. Cpl Cole noticed nothing unusual about Cpl [D]'s demeanor that day. She also testified that Cpl [D] later let her read a letter she was writing to her boyfriend about her encounter with the appellant. Nothing in the letter, or in what she then told Cpl Cole about the incident, suggested the sex was nonconsensual. Record at 820–23. Indeed, from all her conversations with Cpl [D] on this topic, Cpl Cole interpreted Cpl [D]'s comments as indicating that the sex she had with the appellant had been consensual. Record at 838. She went on to testify that rumors were rampant at their unit concerning Cpl [D]'s sexual encounter with the appellant, and that it was only after these rumors surfaced that Cpl Cole learned Cpl [D] was claiming her sex with the appellant was nonconsensual. Record at 839. Cpl Cole also testified as to Cpl [D]'s poor reputation for truthfulness in the unit, and her own opinion that Cpl [D] was not a truthful person. Record at 826.

Approximately one week after the alleged rape and forcible sodomy, Cpl [D] was interviewed by Cpl Acevedo and Cpl Guzman, who told her of the rumors, and asserted that the officers in her unit were aware of them. Cpl [D], who was upset by the rumors, described to them what occurred, but again never claimed that she had been "raped." Indeed, at the conclusion of the conversation, both Cpl Acevedo and Cpl Guzman interpreted Cpl [D]'s comments to indicate that she had engaged in voluntary intercourse with the appellant. Record at 767. Even after speaking to these two noncommissioned officers, Cpl [D] still did not report the rape. It was not until May of 1995, some eight months after the incident, that Cpl [D] made a statement to an officer in her unit, and then to a Naval Criminal Investigative Service [NCIS] agent, alleging that the appellant had raped her. She reported to NCIS that she had told both Acevedo and Guzman of the rape. When later confronted by the fact that both these individuals denied being told by her that the appellant had raped and sodomized her against her will, Cpl [D] offered to change her statement and say that she was "only sodomized." Record at 767.

Sergeant Rogers, the appellant's roommate, saw Cpl [D] the morning after the alleged rape. He testified that Cpl [D] came to their barracks room and inquired about the whereabouts of the appellant. When told that the appellant was with his girlfriend, Cpl [D] appeared angry and allegedly stated, "I thought they broke up?" Finally, both Cpl [D]'s current executive officer and former executive officer testified and expressed their opinions as to Cpl [D]'s lack of truthfulness.

### The Incident Involving Ms. [H]

The second set of allegations against the appellant involved a civilian, Ms. [H], the 23–year–old girlfriend of another Marine who resided in the appellant's barracks. On 4 February 1995, Ms. [H] called the barracks room of her boyfriend, Cpl Rogers,[2] and learned from his roommate, Cpl Dustman, that Cpl Rogers was not there. She nevertheless decided to drive from her home in Laguna Niguel, California to the barracks at Edson Range on Camp Pendleton (approximately 60 miles) to visit with Cpl Dustman. She testified that she had previously visited her boyfriend at his barracks on Camp Pendleton approximately once a week—mostly on weekends—over the last six months. On this occasion, she claimed she came to the base to "hang out" with Cpl Dustman and go to the enlisted club with him, despite the absence of her boyfriend. Record at 407.

When Ms. [H] arrived at the barracks that evening at approximately 1900, she found Cpl Dustman and the appellant in Dustman's room drinking beer. Ms. [H] knew the appellant from approximately twelve previous contacts she and her boyfriend had with him at the barracks. Record at 411. Indeed, the appellant had previously been introduced to Ms. [H] by her boyfriend. *Id.*

The appellant and Cpl Dustman informed Ms. [H] that they had been drinking since approximately 1100 that morning, and offered her a beer. She accepted. She later learned from these two Marines that her boyfriend was out that evening with another woman, and testified that she felt "upset, jealous and betrayed." Record at 417. She remained in Cpl Dustman's room from approximately 1900 to 2100 talking with the appellant about problems he was having with his girlfriend. Ms. [H] estimated that she consumed two or three bottles of beer during this period. Record at 415.

At approximately 2115, Ms. [H], the appellant, Cpl Dustman, and Cpl Martinez drove to the enlisted club on Camp Pendleton in Ms. H's two-door Nissan Sentra. At the club, Ms. [H] consumed three glasses of beer. She danced off and on with a group of people, including the appellant. According to Ms. [H], while she was dancing, the appellant came up behind her and bumped her. When she turned around to see who it was, the appellant "French kissed" her. Record at 425–26. She testified that she pulled away from the appellant and said, "What do you think you are doing?" The appellant replied, "I don't know," and rolled his eyes. Ms. [H] and the appellant then left the club to go back to the barracks to retrieve her car.[3] On their ride to the barracks in a taxicab, Ms. [H] testified that the appellant slid over next to her, began kissing her, and attempted to undo the belt of her shorts. She stated she resisted the appellant's advances and told him, "This isn't right, please stop." Record at 362. Once back at the barracks, the appellant went up to his room to retrieve Ms. [H]'s car keys.[4] Ms. [H] went with him, but remained on the stairs outside the room as he retrieved the keys. The appellant then walked Ms. [H] to her car in the parking lot. She had agreed to give the appellant a ride back to the enlisted club so that he could locate Cpl Dustman (who they had left behind). According to Ms. [H], she opened the passenger door and let the appellant into her car. Once inside, the appellant leaned over and began kissing her. Despite her claimed protests, Ms. [H] testified that the appellant leaned across her, released the seat lever causing her seat to recline back, and began forcing himself upon her. Record at 362. Ultimately, according to Ms. [H], the appellant removed her shorts and panties and raped her in the driver's seat of her car.

Ms. [H] testified that, after the rape, she dressed herself in the back seat, and the appellant drove her car to the enlisted club to find Cpl Dustman. Sometime during the short drive, Ms. [H] moved from the backseat up to the passenger seat. Record at

---

**2.** At the time of trial, Cpl Rogers had been promoted to the rank of Sergeant.

**3.** Ms. [H] had allowed Cpl Martinez, who had duty, to drive her car back to the barracks from the enlisted club.

**4.** It had been previously arranged that Cpl Martinez would leave Ms. [H]'s car keys in the appellant's room.

366. Upon arriving at the club, the appellant allegedly grabbed Ms. [H] by the arm and led her through the large crowd in what ultimately was a fruitless quest to locate Cpl Dustman. After approximately ten minutes, and several unsuccessful laps around the enlisted club, the appellant allegedly led Ms. [H] back out to her car and gave her the keys. The appellant got into the passenger seat and the two drove back to the barracks.

Ms. [H] testified that she and the appellant then sat in her car in the barracks parking lot for over an hour at this point talking about how her relationship with Cpl Rogers "was now ruined," and "arguing" about how the appellant was going to explain to Cpl Dustman where he had been that night. Record at 482–84. When she finally asked the appellant to "please go," he ostensibly replied, "wherever you go tonight, I'm going with you." Record at 370. Ms. [H] then drove as if heading to her home. She testified that, because of heavy fog and her inability to see, she turned around and drove back through the Edson Range gates headed back towards the appellant's barracks.

According to Ms. [H], the appellant directed her to drive to a building where he once worked, and, once inside, raped her a second time and forcibly sodomized her in a bunkroom. She testified that her ordeal eventually ended around sunrise, when she was finally able to obtain her car keys from the appellant and leave. Ms. [H] drove to her home and went to sleep for a few hours, but ultimately reported the appellant's alleged acts to the police later that same day. A comprehensive medical examination of Ms. [H] was conducted later that day revealing significant trauma and injury to Ms. [H]'s genitalia and anus. Record at 604; Prosecution Exhibits 9 and 18.

As was the case with Cpl [D], Ms. [H]'s allegations were very much in dispute, and, according to the defense, peppered with inconsistencies. Initially, the defense pointed out Ms. [H]'s history of depression, suicidal ideation, and extensive treatment with at least six different anti-depressant medications. Record at 392. Also, Ms. [H] admitted going home and initially going to sleep after returning from allegedly being twice raped and once sodomized. She also admitted being concerned over her lack of health insurance, and, before calling the police, admitted first calling two friends and then numerous medical caregivers to ascertain her various treatment options. She acknowledged learning that if she reported the rape to the police, then they would pay for her "health care." Record at 397.

Ms. [H] went to the enlisted club that night with Cpl Dustman, the appellant, and others after learning that her boyfriend was out with another woman. Record at 896. She admitted being angry and jealous over her boyfriend's apparent infidelity. Record at 417 and 896. When Cpl Martinez needed to return to the barracks early that night, Ms. [H] admitted giving him her car keys and instructing him to put them in the appellant's room, vice her boyfriend's, for her later retrieval. Record at 424 and 898. Upon later leaving the enlisted club with the appellant, Ms. [H] claimed that the appellant vigorously groped her in the backseat. However, she could not explain why the taxi cab driver did nothing to intervene, or why she made no complaint to that individual. Record at 431–32. The defense also exploited the fact that Ms. [H] voluntarily accompanied the appellant up to his barracks room after this incident to get her keys, then subsequently allowed him into her locked car in the parking lot. Record at 354, 362, 437, and 445.

After allegedly being raped in her car by the appellant, Ms. [H] drove with him to the enlisted club and walked through the club many times looking for Cpl Dustman. Despite the fact that Ms. [H] passed or encountered numerous military and civilian personnel at this time, including club staff members, she never reported the rape to anyone or sought any assistance. Ms. [H] explained this failure by claiming she thought anybody "military" would think she was lying and back the appellant. Record at 368 and 466. Ms. [H] also admitted to sitting in the barracks parking lot with the appellant, after leaving the club, for over an hour discussing her boyfriend and concocting a story they would later tell Cpl Dustman concerning where they had gone that

night. She admitted telling the appellant that it was "important to get [their] stories straight," and that they needed to be able to explain how she got back to the barracks and got her keys from the appellant. Record at 486. Although numerous Marines walked past her car on their way back from the enlisted club during this period, Ms. [H] never screamed or sought assistance from any of them. Record at 493.

The defense attacked Ms. [H] vigorously concerning the numerous opportunities she had that night and the following morning to either leave the appellant or to report his crimes to military authorities or other personnel they encountered. In addition to her silence when escorted through the enlisted club by the appellant after the alleged first rape, she was similarly silent when passing armed gate guards both exiting and reentering the Edson Range Area.[5] Also, the defense pointed out the fact that Ms. [H] never attempted to flee during the four or five separate, unescorted trips she made to the restroom during the period of the alleged second rape. Record at 514. She claimed that, despite the many opportunities she had to leave, she stayed because the appellant had her car keys.

Ms. [H] also had significant difficulty explaining a personal business card that she gave to appellant that contained her telephone number. She claimed that she gave the card to the appellant earlier in the evening while they were all in Cpl Dustman's room drinking. She stated further that she had written down the name of a florist on the back of the card from which the appellant could buy nice flowers for his girlfriend. An NCIS agent later confronted Ms. [H] with the actual business card, obtained from the appellant, and the fact that there was nothing written on the back. She could not adequately explain this fact, but steadfastly denied that she gave the card to the appellant so that he could later call her for a date. Record at 501–02, 753–55. She also told the NCIS agent that, during the second alleged sexual assault, she had bitten and scratched

the appellant on the neck and chest hard enough to leave marks. Record at 520. No evidence of scratch or bite marks was found on the appellant during a visual examination conducted on 10 February 1995. Record at 755–57, Defense Exhibits HH–MM.

Finally, the defense disputed the significance of Ms. [H]'s physical injuries. A defense expert witness, Dr. Johnathon Cayle, Commander, Medical Corps, U.S. Navy, testified that Ms. [H]'s injuries could have resulted from "vigorous" consensual sex with another. Record at 791. He also stated he had seen similar injuries from consensual sex in a small percentage of the women he had personally examined. Record at 809.

### Statements of the Appellant

The appellant did not testify on the merits of this case, but his sworn statement to the Naval Criminal Investigative Service [NCIS] was offered into evidence by the prosecution and admitted without defense objection. Prosecution Exhibit 19. In that statement he adamantly denied raping or forcibly sodomizing Ms. [H]. He claimed that the acts of vaginal intercourse with her were completely consensual. The appellant claimed that anal intercourse had occurred "accidentally" while he and Ms. [H] were attempting vaginal intercourse "from behind." Prosecution Exhibit 19 at 4. As the appellant explained it:

> At one point, we moved around and I attempted to enter her vagina from behind. At first I put my penis in what I thought was her vagina, but it was not. It was her anus. I pushed it all the way in and she said, "Ow," and "You're in the wrong spot." So I pulled it out. I did not mean to put my penis in her anus. It was an accident.

*Id.*

In two subsequent interviews of the appellant conducted by Special Agent Fahey of NCIS in June 1995, he was specifically questioned about the additional allegations made against him by Cpl [D]. The appellant again adamantly maintained his innocence and as-

---

5. In an apparent continuation of her earlier expressions of distrust at this point for anyone "military," Ms. [H] elaborated that she was

afraid the guards might also rape her. Record at 497.

serted that his acts of vaginal and anal intercourse with Cpl [D] were also consensual. Additionally, he reiterated his earlier assertions that the sexual acts with Ms. [H] were consensual. Record at 749–68.[6]

### Severance and "Spill-over"

In a preliminary Article 39(a), UCMJ, session conducted before Judge Hess on 26 February 1996, the defense timely raised and litigated a Motion for Appropriate Relief seeking severance and separate trials of the charges involving Ms. [H] from those involving Cpl [D]. Record at 108–20; Appellate Exhibit II. The defense argued vigorously that joinder of these separate charges would result in manifest injustice to the appellant because of the remarkably similar nature of the offenses, and the inevitability of members adopting a "where there's smoke there must be fire" rationale in rendering findings. Record at 114. Counsel specifically raised defense concerns over the fact that the offenses involving Cpl [D], which the Government initially elected not to pursue at all for lack of substantial evidence, were now resurrected and juxtaposed with the later allegations made by Ms. [H]. Record at 113. The Government all but conceded the fact that prejudicial spill-over was a significant possibility in this case,[7] but asserted that prejudice could be avoided by appropriately crafted and emphasized instructions to the members. Record at 118; *see also* Record at 239.

Judge Hess heard the defense severance motion, and after significant and thoughtful

analysis, ultimately denied it. Notwithstanding his denial, Judge Hess was acutely sensitive of the need to take affirmative measures in this case to prevent prejudicial spill-over. He expressed his concerns as follows:

> If I'm the military judge in this case, and perhaps more importantly, if I'm not, the defense, and the government for that matter, need to be aware that there are a number of techniques that can be used in curtailing any spill-over effect in the trial. And the defense needs to be alert to request, if you so desire, such techniques as—basically boxing up one set of offenses and putting them on at one time, giving the members an instruction, and then putting on the second offense.

> For example, the members can be sensitized to this on voir dire. Both sides can be procedurally put in a situation whereby they give their opening statements, for example, and all their evidence as to one set of offenses. All that stops, appropriate instructions given, and then they do the trial as to the second set of offenses. And these sort of techniques, I think, you know, help the members keep the issue separate, if you want to do that. And I'd certainly be favorably inclined to consider such a request and it's something the defense should keep in mind.

Record at 120.

By the time the next Article 39(a), UCMJ, session was conducted in this case, Judge Hess had been relieved by Judge Hollerich. At this session, and apparently acting on

---

6. The appellant's statements made in June 1995 were summarized by Special Agent Fahey as "the results of my interview" in a report that he subsequently prepared, but no additional sworn statements were taken from the appellant documenting his statements. Record at 750.

7. When the trial counsel was asked by Judge Hess to address the defense assertion "that the Government may be using, let's say, a strong rape charge, for example, to overwhelm the members, if you will, on a weak rape charge," Record at 116, the prosecution responded:

> "To some degree, sir, I think, quite frankly, there is, in all honesty ... on the charge with Corporal [D], I guess it's what you'd call in the old days a he said/she said type of rape charge. There's no physical evidence. Corporal [D] didn't report the crime. She did mention [it], as you've heard, to other people, but she didn't

like officially report it. There's no SART [Sexual Assault Response Team] evidence.

> However, in contrast ... Miss [H], the civilian, who immediately reported it to the Orange County Sheriff's Department, had a full SART examine (sic) done; you know, went through the whole nine yards; and the Government plans to introduce physical evidence on her rape....

> So, a long winded answer, sir—I think, you know, you could—there are distinctions between the two cases, where really the main distinction is physical evidence versus no physical evidence with the victims.... So, I don't view it as an appreciable difference, but there definitely is an objective (sic) different level of evidence with both victims...."

Record at 116. *See also* Record at 239.

Judge Hess' previous guidance, the defense raised another Motion for Appropriate Relief renewing their request to sever the charges and, alternatively, seeking to bifurcate the proceedings pursuant to RULE FOR COURTS-MARTIAL 801(a), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.) and Military Rule of Evidence 611(a), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.). Appellate Exhibit XXVII. In regard to a bifurcated proceeding, the defense specifically requested the military judge to provide precautionary instructions to the members, and separate the presentation of evidence, arguments and instructions on findings relative to the separate allegations (i.e., those involving Cpl [D] from those involving Ms. [H] ). Record at 238–39; 242–43. They also asked the military judge to use separate findings worksheets in regard to each separate set of offenses. Appellate Exhibit XXVII at 2; *see United States v. Kirks*, 34 M.J. 646, 651–52 (A.C.M.R.1992).

In responding to the defense motion, the trial counsel openly conceded the danger of spill-over. Though he opposed a bifurcated proceeding, he acknowledged the need for prophylactic measures aimed at preventing prejudice to the accused:

> The government would concede this much on the motion, sir, that we are dealing with two very related type charges, almost identical—really they are identical, rape and forcible sodomy. *And without this court doing anything, there would be a dangerous spill-over, sir.*
>
> However, as I pointed out in my brief, there are adequate remedies this court can

take, short of bifurcating the trial. Specifically, instructions on the law in this area and a vigorous voir dire process on this question. I think, sir, those two remedies or the precautionary measures this court can take would ameliorate any dangers whatsoever that the members would have with any spillover between the victims in this case.

Record at 239 (emphasis added).

Reasoning that bifurcation procedures introduced "a kind of cumbersome artificiality to the presentation of the evidence in the case for really no discernible benefit even to the accused," the military judge denied the motion. Record at 243–44.[8] In so ruling, the military judge went on to state, "I have to say that I obviously will be happy to give an appropriate instruction to the jury in connection with the danger of spill-over." Record at 244. He reserved making a final ruling on the instructions he would give on findings until all the evidence in both cases had been presented. *Id.*

Trial on the merits thereafter began and was hotly contested. The proceedings and testimony before findings alone cover over one-thousand pages in the record of trial. Upon revisiting the issue of the need for a spill-over instruction before the members closed to deliberate on findings, much discussion was had.[9] After initially agreeing to give a spill-over instruction, the military judge subsequently reversed himself and declined to do so. Record at 1052 and 1065. His ruling was based upon the then newly promulgated Mil.R.Evid. 413,[10] which "provide[s] for more liberal admissibility of char-

---

8. The military judge further elaborated upon his ruling by stating:

   Ultimately, the same charges and specifications are going to be decided by the same jury at the same time on the basis of the same evidence, all of which is going before them at the time of their deliberations. And so, it really seems to me that the benefit here to the accused is so small as to be almost indiscernible. I consider the procedural clumsiness of such a proceeding to be significant. I would be more than happy to do that if I actually thought there was a discernible benefit to the defense, but I just honestly don't see it.

   Record at 244.

9. The debate over the need for a spill-over instruction covers over 25 pages in the record. Record at 1041–69.

10. Federal Rule of Evidence 413 was enacted by Congress on 13 September 1994 and became effective for federal courts on 10 July 1995. By operation of law, the rule became effective in the military on 6 January 1996, just three days before appellant's initial arraignment. *See Violent Crime Control and Law Enforcement Act of 1994*, § 329035, PUB.L. No. 103–32 (1994); MIL.R.EVID. 1102 (amendments to the Federal Rules of Evidence shall apply to the Military Rules of Evidence 18 months after the effective date of such amendments, unless action to the contrary is taken by the President).

acter evidence in criminal cases [involving] sexual assault where the accused has committed a prior act of sexual assault."[11] After a lengthy discussion with counsel concerning Congress' intent in passing Mil.R.Evid. 413, the military judge reasoned:

> [I]t seems to me that the most logical application of Military Rule of Evidence 413 to this case is that no spill-over instruction should be given at all because the Government can argue from the offenses involving Corporal [D] that they tend to show guilt on the part of the accused as to sexual assaults perpetrated against Ms. [H] and vice versa.

Record at 1063.

The judge further clarified his rationale later in the record when he declared:

> [W]hat I intend to do is simply not instruct on spill-over at all since, as I perceive it, the purpose of the spill-over instruction is to provide a limitation to the jury on their use of the evidence, and my interpretation of Military Rule of Evidence 413 is simply that there is not a limit on the use of that evidence.

Record at 1068.

The members ultimately returned findings of guilty on both sets of offenses involving Cpl [D] and Ms. [H].

We find that the military judge abused his discretion in refusing to give the defense requested spill-over instruction to the members prior to their deliberations on findings. *See United States v. Maxwell,* 45 M.J. 406, 424 (1996)(citing *United States v. Damatta–Olivera,* 37 M.J. 474, 478 (C.M.A.1993)). Because we find that prejudicial spill-over inevitably tainted the findings in this case, we must reverse.

**11.** MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), App. 22, at A22–36.

**12.** "Lest there remain any doubt about the constitutional stature of the reasonable doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. at 364, 90 S.Ct. 1068. (Brennan, J.)

## Discussion

■ One of the most basic and sacred notions in American jurisprudence is the presumption of innocence that attaches to individuals accused of crimes. To overcome this presumption, it is well established that the fundamental fairness guarantee of the Due Process Clause of the Constitution requires the prosecution to prove each and every element of every offense alleged against an accused by legal and competent evidence beyond a reasonable doubt. *Estelle v. McGuire,* 502 U.S. 62, 78, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)(O'Connor, J., concurring in part and dissenting in part). Like the presumption of innocence, the requirement for proof beyond a reasonable doubt has constitutional underpinnings.

> The reasonable doubt standard plays a vital role in the American scheme of criminal procedure. It is the prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law.

*In re Winship,* 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (citations and internal quotes omitted).[12]

It has also been held that the Due Process Clause will invalidate any evidentiary rule that "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency," including the presumption of innocence. *See United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), *cited in Dowling v. United States,* 493 U.S. 342, 353, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990); *United States v. Castillo,* 140 F.3d 874, 881 (10th Cir.1998).[13]

**13.** This principle would prohibit the use of evidentiary presumptions in a jury instruction that had the effect of relieving the prosecution of its burden of proof beyond a reasonable doubt. *Estelle v. McGuire,* 502 U.S. at 77–78, 112 S.Ct. at 485 (O'Connor, J., concurring in part and dissenting in part)(citing *Francis v. Franklin,* 471 U.S. 307, 313, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) and *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)).

Similar concerns exist when separate offenses are joined together for trial at the same time. The possibility is very real that juries will use the evidence of one of the crimes charged to infer a criminal disposition on the part of an accused in regard to other crime(s) charged. Generally, the law seeks to prevent juries from cumulating the evidence of the various crimes charged to find guilt when, if considered separately, they would not so find. *Drew v. United States,* 331 F.2d 85, 87 (D.C.Cir.1964). As Judge McGowan wrote in *Drew*:

> It is a principle of long standing in our law that evidence of one crime is inadmissible to prove disposition to commit crime, from which the jury may infer that the defendant committed the crime charged. Since the likelihood that juries will make such an improper inference is high, courts presume prejudice and exclude evidence of other crimes unless that evidence can be admitted for some substantial, legitimate purpose. *The same dangers appear to exist when two crimes are joined for trial, and the same principles of prophylaxis are applicable.*

*Id.* at 89–90 (emphasis added).

These concerns were perhaps best summarized by then Circuit Court of Appeals Judge Learned Hand in *United States v. Lotsch,* 102 F.2d 35, 36 (2d Cir.1939), when he said:

> There is indeed always a danger when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all. This possibility violates the doctrine that only direct evidence of the transaction charged will ordinarily be accepted, and that the accused is not to be convicted because of his criminal disposition. Yet in the ordinary affairs of life such a disposition is a convincing factor, and its exclusion is rather because the

issue is practically unmanageable than because it is not rationally relevant. . . .

In military practice, concerns arising from joinder of offenses must be vigilantly addressed by all practitioners, as severance is rarely granted. As Chief Judge Cox accurately observed in *United States v. Haye,* 29 M.J. 213, 215 (C.M.A.1989), severance motions have historically been frowned upon,[14] and unitary sentencing in the military favors joining all known offenses at a single trial.[15] We are apparently comfortable in military practice with the assumption that properly drafted and delivered instructions are sufficient to prevent juries from cumulating evidence, thus avoiding improper spill-over. *See United States v. Duncan,* 48 M.J. 797, 803 (N.M.Ct.Crim.App.1998); *United States v. Diaz,* 39 M.J. 1114, 1117–8 (A.F.C.M.R. 1994). That is a safe assumption only to the extent that such instructions are actually given. In this case they were not.

The standard spill-over instruction currently used in military court-martial practice reads as follows:

> *Each offense must stand on its own and you must keep the evidence of each offense separate.* The burden is on the prosecution to prove each and every element of each offense beyond a reasonable doubt. *Proof of one offense carries with it no inference that the accused is guilty of any other offense.*

Military Judges' Benchbook, Dep't of the Army Pamphlet 27–9 at 837 (30 Sep 1996)(emphasis added).

We must assess the military judge's decision to refuse to give a spill-over instruction in this case upon his reading of Mil.R.Evid. 413 against the due process backdrop discussed above. Under the provisions of Mil. R.Evid. 413, when an accused is charged with a crime involving sexual assault, evidence of any similar acts of sexual assault committed by him or her are admissible and may be used for any relevant matter, which includes demonstrating his or her "propensity" to

---

14. Military practice in this regard stands in sharp contrast to federal criminal procedure, Fed.R.Crim.P. 8 and 14, which has far more exacting standards for joinder.

15. R.C.M. 307(c)(4) provides that: "Charges and specifications alleging all known offenses by an accused may be preferred at the same time."

commit such crimes.[16] Historically, this type of bad character evidence offered to prove that the accused acted in conformity with that character was strictly prohibited—not because it wasn't relevant, but because it was often **too** relevant. *See Michelson v. United States*, 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948). "The inquiry [into character] is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad character record and deny him a fair opportunity to defend against a particular charge." *Id.* The prevailing concern has been that bad character evidence blurs and confuses other evidence in a trial and influences the jury to convict an accused not for committing the crime charged, but for generally being a bad person.[17] Mil.R.Evid. 413 represents a significant (and controversial) departure from the large body of jurisprudence addressing character evidence.[18]

In the typical Mil.R.Evid. 413 scenario, the prosecution offers a *prior* sexual assault (i.e., one not charged at the ongoing proceeding) as evidence that the accused had the propensity to commit the separate *charged* offense. This appears to be what the drafters of Mil. R.Evid. 413 contemplated.[19] Often, this prior sexual assault will have resulted in some form of a conviction. Such evidence must first be carefully considered by the military judge to determine its admissibility and the limitations, if any, upon its use.[20] As far as

---

**16.** Mil.R.Evid. 413(a) specifically provides that "[i]n a court-martial in which the accused is charged with an offense of sexual assault, evidence of the accused's commission of one or more offenses of sexual assault is admissible and may be considered for its bearing on any matter to which it is relevant."

**17.** Robert F. Thompson III, *Character Evidence and Sex Crimes in the Federal Courts: Recent Developments*, 21 U. Ark. Little Rock L.J. 241, 246 (1999).

**18.** *See* David J. Karp, *Symposium on the Admission of Prior Offense Evidence in Sexual Assault Cases: Evidence of Propensity and Probability in Sex Offense Cases and Other Cases*, 70 Chi. Kent L.Rev. 15 (1994); Robert F. Thompson III, *Character Evidence and Sex Crimes in the Federal Courts: Recent Developments*, 21 U. Ark. Little Rock L.J. 241 (1999).

**19.** During Congressional debate on Mil.R.Evid. 413, Representative Susan Molinari, the primary sponsor of the Rule, only references "prior acts" evidence and "uncharged" misconduct. She urged that Mil.R.Evid. 413 be liberally construed so that finders of fact can accurately assess an accused's criminal propensities in light of his *past conduct*. *See* 140 Cong. Rec. H8991–92 (Aug. 21, 1994)(statement of Susan Molinari)(emphasis added).

**20.** Indeed, the limited body of case law currently addressing Mil.R.Evid. 413 has begun to define, and actually somewhat limit, how this brand of "propensity" evidence should be received and utilized at trial. Although Mil.R.Evid. 413 never explicitly states that the balancing test of Mil. R.Evid. 403 must be applied in each case where this evidence is admitted, military and federal case law has clearly established that it does. *United States v. Enjady*, 134 F.3d 1427, 1433–34 (10th Cir.1998), *cert. denied,* ⸺ U.S. ⸺, 119 S.Ct. 202, 142 L.Ed.2d 165 (1998); *United States v. Castillo*, 140 F.3d 874, 882 (10th Cir.1998); *United States v. Guardia*, 135 F.3d 1326, 1330 (10th Cir.1998); *United States v. Mound*, 149 F.3d 799, 800–01 (8th Cir.1998); *United States v. Sumner*, 119 F.3d 658, 661–62 (8th Cir.1997); *United States v. Green*, 50 M.J. 835, 837–39 (Army Ct.Crim.App.1999); *United States v. Wright*, 48 M.J. 896, 899 n. 1 (A.F.Ct.Crim.App. 1998); *United States v. Hughes*, 48 M.J. 700, 716 (A.F.Ct.Crim.App.1998)(Mil.R.Evid. 414). Without the procedural protections of Rule 403, the constitutionality of Mil.R.Evid. 413 would be seriously in doubt. *Id.* There now appears to be a number of predicate determinations that every military judge must make when facing the decision of whether or not to admit evidence under Mil.R.Evid. 413. These include:

Determining that the accused is charged with "an offense of sexual assault." Mil R.Evid. 413(a) and (d)(defining an "offense of sexual assault");

Determining that the evidence offered is "evidence of the accused's commission of one or more offenses of sexual assault." Mil R.Evid. 413(a);

Determining that the evidence is relevant under Mil.R.Evid. 402 ("Evidence which is not relevant is not admissible."). In this regard, the military judge must conclude that the evidence shows the accused had a particular propensity bearing on the charged offense. *Guardia*, 135 F.3d at 1332. Part of this relevance determination involves the military judge concluding that the members could reasonably find the conditional fact (i.e., that the accused com-

we can discern, this is a case of first impression as it relates to the application of Mil. R.Evid. 413 to separately charged sexual assault offenses in the same case. We can find no reported case in which Mil.R.Evid. 413 was held to allow one set of *alleged* sexual assault offenses to show an accused's "propensity" to have committed a different set of *alleged* sexual assault offenses (and vice versa), when both sets of offenses were joined together at one trial where the accused was cloaked in the presumption of innocence with respect to all. Indeed, we believe this case presents a constitutional quagmire that the drafters of Mil.R.Evid. 413 probably never envisioned.

Although acknowledging the serious constitutional issues raised by application of Mil. R.Evid. 413 to separately charged sexual assault offenses alleged against an accused at a single trial where innocence is presumed, our ruling today is limited strictly to our finding that the military judge abused his discretion in failing to give the defense requested spill-

over instruction. Under the facts presented here, such an instruction was essential to ensure that the members were aware that each separate element of each offense had to be established by legal and competent evidence beyond a reasonable doubt, and that the Government was not alleviated of its burden of proof as to one set of sexual assault offenses by the presence of another similar, but distinct, set of sexual assault offenses.[21] In our opinion, nothing in Mil. R.Evid. 413 alters this fundamental tenet of American jurisprudence.

Standing apart, the Government's cases regarding the separate offenses involving Cpl [D] and Ms. [H] were weak and riddled with significant discrepancies. When joined together, the temptation of the members to apply "where there's smoke there must be fire" logic simply cannot be discounted or ignored. We additionally note that the prosecution could not resist the temptation to make compelling "similarity" arguments to the members in their closing address,[22]

mitted the prior sexual assault) by a preponderance of the evidence. *Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); *United States v. Mirandes–Gonzalez*, 26 M.J. 411, 413–14 (C.M.A.1988).

Determining and ruling that the prejudicial impact of the evidence is substantially outweighed by its probative value. Mɪʟ.R.Evɪᴅ. 403; *Guardia*, 135 F.3d at 1331; and,

Determining that proper disclosure and notice, at least 5 days before trial, of the Government's intent to offer this evidence has been made. Mɪʟ R.Evɪᴅ. 413(b).

Because of the unique manner in which the Mil.R.Evid. 413 issue arose in this case, these predicate concerns are only haphazardly addressed in the record (e.g., the military judge never addresses the Mil.R.Evid. 403 analysis in relation to whether a spill-over instruction was required). Obviously, the military judge did not have the benefit of the above-cited opinions addressing Mil.R.Evid. 413 at the appellant's court-martial, which was tried in 1996.

21. We also recognize the very real possibility that the members in this case found the appellant guilty of the *prior* offenses (the weaker allegations involving Cpl [D]) as a result of improper spill-over from the *later* offenses (the somewhat stronger allegations involving Ms. [H]). Such a

result would illogically allow proof of a *later* offense to establish an accused's "propensity" to commit a *prior* offense, which Mil.R.Evid. 413 does not address. Both the "Editorial Comment" and "Drafter's Analysis" to Mil.R.Evid. 413 solely address the use of "prior act" evidence.

22. This occurred on at least three separate occasions during trial counsel's closing arguments:

And I ask you to consider for a moment Corporal [D] and [Ms. H] in conjunction. I've been talking about them separately so far. What is the probability, members of the court-martial, that two women—and the evidence is unrelated, independent, didn't even know each other—two separate women would come forward with the same type of allegations involving the same approximate time frame, involving the same man, and that they both [would] be lying and that both [would] be false? The probability of that is so small it's almost laughable—that two women independent of each other would come up with this. And there's no evidence whatsoever that [Ms. H] and Cpl [D] have colluded together, have come together for some unknown reason to get Lance Corporal Myers. There's no reason that they would do this together that's been offered. It doesn't make any sense.

Record at 1085.

You know already from Corporal [D]'s situation that he's already admitted to having consensual anal sodomy with Corporal [D] a cou-

thereby effectively soliciting spill-over. *See United States v. Diaz*, 39 M.J. 1114, 1118 (A.F.C.M.R.1994)("in a case where the potential for spill-over exists between offenses, the military judge walks a judicial tightrope in permitting any 'similarity argument.'"). We believe the findings in this case reflect that impermissible crossover occurred.

When the appellant's motion for severance was refused, followed by the denial of his request for bifurcated trial proceedings, his last hope for avoiding prejudicial spill-over in this case came at the point where the military judge instructed the members on their findings deliberations. The judge's instructions provided the members with absolutely no guidance whatsoever for how they should view the two separate sets of sexual assault charges in this case, and, in our opinion, rendered it impossible for these fact-finders to not cumulate the evidence in what were remarkably similar offenses occurring five months apart. *See generally United States v. Foster*, 40 M.J. 140, 147–48 (C.M.A.1994); *United States v. Palacios*, 37 M.J. 366, 368–69 (C.M.A.1993); *United States v. Haye*, 29 M.J. 213, 215 (C.M.A.1989); *United States v. Hogan*, 20 M.J. 71, 72–73 (C.M.A.1985); *United States v. Sanchez*, 50 M.J. 506, 511–12 (A.F.Ct.Crim.App.1999). As was the case in *Hogan*, "[h]ad the military judge bethought himself to instruct the court members to keep the evidence of the two offenses separate during their deliberations, the chances of their cumulating the evidence

would have been substantially diminished, and we might have reached a different result." *Hogan*, 20 M.J. at 73. Because of the absence of any prophylactic measures in this case to prevent such, the danger is simply too great that one set of *alleged* sexual assault offenses spilled-over and served as "proof" of the other set of *alleged* sexual assault offenses, improperly eroding the appellant's presumption of innocence.

We acknowledge the apparent paradox that, had the appellant's sexual assault offenses been severed, proof of one set of sexual assault offenses may have been admissible under Mil.R.Evid. 413 to demonstrate the appellant's propensity to have committed the other set of sexual assault offenses alleged at trial. Yet, prior to their admission, the military judge would first be required to ensure that all of the predicate safeguards governing admission of Mil.R.Evid. 413 evidence had been satisfied, and then clearly record his or her careful balancing under Mil.R.Evid. 403 on the record. *See supra*, note 20; *United States v. Guardia*, 135 F.3d at 1331–32. These predicate safeguards are what ensure that Mil.R.Evid. 413 evidence passes constitutional muster. *Enjady*, 134 F.3d at 1433.

We cannot envision a scenario where Mil.R.Evid. 413 would ever obviate the need to provide a defense requested spill-over instruction where unrelated offenses were joined together for trial. Even where Mil.

ple of months (sic) prior to [Ms. H]. And I would just submit to the members of the court that whatever it is, whether it's sodomy or some other human experience, when you have experience in something, when you have done something before, the inherent probability of having an accident the next time is severely diminished, is severely lessened. Specifically in this case, if he knew where Corporal [D]'s anus was, it's hard to believe he had a problem when he was with [Ms. H]. It's hard to believe that.
Record at 1086.
In the end, the defense would like you to believe that Lance Corporal Myers is just simply the unluckiest Marine that ever lived. I mean, here's a Marine who just had the terrible misfortune to have Ms. [H], this sort of unstable woman with mental conditions who fabricates these webs of sexual deceit, that he just happened to have sex with her, not knowing what he was doing—I mean, as far as what

he was getting in return—and that she would pursue charges for 14 months against him. Pretty unlucky, but that's what he had.
And then in (sic) the same time, they want to feel—they want to explain Cpl [D] away as he just is unlucky because he happened to have sex again with probably the most vindictive, revengeful, spiteful woman that's ever lived, who no matter what, no matter what personal sacrifice she has to go through to see this case to the end, she's willing to do that because Lance Corporal Myers didn't want to go to the birthday ball with her. I mean, it's just unreasonable that, two women, two women, just by chance, by sheer chance would be willing to do everything they have, to suffer again a second time after their crimes, to go through this process, and both be willing to come into court and say Lance Corporal Myers did these things, be subjected to everything they are. It just doesn't make sense. Doesn't make sense.
Record at 1140–41.

R.Evid. 413 evidence is properly admitted, proof of one sexual assault offense still carries no *inference* that the accused committed another sexual assault offense, it only demonstrates the accused's *propensity* to commit that type of offense, which may or may not be relevant and probative in determining whether he actually committed the charged offense.

■ When severance was denied in this case, the military judge had an obligation to employ prophylactic measures to ensure that the appellant was not materially prejudiced by trying these offenses together. At a minimum, and notwithstanding Mil.R.Evid. 413, this required an appropriately crafted and emphasized spill-over instruction that clearly informed the members that they must keep the alleged acts separate and that they could not convict on one offense merely because they found the accused guilty of another offense. *See United States v. Southworth,* 50 M.J. 74, 77 (1999); *Sanchez,* 50 M.J. at 512. Because none was given in this case, and because we believe improper spill-over occurred that violated the fundamental fairness guarantee of the Due Process Clause and materially prejudiced the substantial rights of the appellant, we must reverse the findings of guilty.

### Conclusion

The findings of guilty are set aside. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.

Senior Judge DORMAN and Senior Judge TROIDL concur.