**UNITED STATES**

v.

**James H. COULTER, Electrician's Mate Second Class (E–5), U.S. Navy.**

**NMCCA 200100482.**

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 24 Aug. 2000.

Decided 26 Sept. 2005.

Capt James D. Valentine, USMC, Appellate Defense Counsel.

Lt Rebecca Snyder, JAGC, USNR, Appellate Defense Counsel.

Frank J. Spinner, Civilian Appellate Defense Counsel.

Capt Wilbur Lee, USMC, Appellate Government Counsel.

Before DORMAN, RITTER, and HARRIS, Appellate Military Judges.

HARRIS, Judge:

A military judge, sitting alone as a general court-martial, convicted the appellant, contrary to his pleas, of committing an indecent act upon a child under the age of 16 years, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. The military judge sentenced the appellant to confinement for 5 years, reduction to pay grade E–1, and a dishonorable discharge. The convening authority approved the sentence as adjudged and, with the exception of the dishonorable discharge, ordered the punishment executed. As an act of clemency, the convening authority waived the automatic forfeiture of all pay and allowances required by Article 58b, UCMJ, 10 U.S.C. § 858b, in favor of the appellant's dependent children for a period of 6 months from the date of his action.

After carefully considering the record of trial, the appellant's five assignments of error and supplemental brief, and the Government's responses, we conclude that the findings and the sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c). As discussed in greater detail below, we reject the appellant's assertions: (1) that the military judge abused his discretion by admitting evidence of prior uncharged child molestation and hearsay statements of the two-year-old victim; (2) that the evidence offered at trial was insufficient to convict the appellant of indecent acts with a child; and (3) that the appellant suffered at the hands of an ineffective civilian trial defense counsel.

## Facts

On 8 September 1999, a Family Support Group meeting was held at the on-base home of Hull Technician Second Class (HT2) L, U.S. Navy, and his wife, Mrs. L. As the president of the Family Support Group, Mrs. L was occupied with matters relating to the meeting. This left HT2 L responsible for bathing and preparing the couple's two children for bed. HT2 L and Mrs. L had a six-year-old son we will refer to as DL, and a two-year-old daughter we will refer to as KL.

As the meeting was drawing to a close, the appellant arrived to retrieve his wife, a Family Support Group member. Since the meeting had not yet concluded, the appellant joined HT2 L, his shipmate from the USS MAHAN (DDG 72), in the upstairs portion of the house. The appellant found HT2 L sitting with the children playing video games. After joining in the games, the appellant followed HT2 L as he took the children to the nearby bathroom and began undressing them. After bathing the children, HT2 L dressed them for bed. With HT2 L's assistance, KL donned a long blue T-shirt and underwear. HT2 L then escorted the children to DL's room where they once again began playing video games. KL sat on a bed with her back against the wall playing a handheld game system, while the appellant and DL were situated on the floor with their backs to KL facing a television-supported game system.

At this point, HT2 L went downstairs to the kitchen. He was absent for somewhere between 5 and 10 minutes. Upon his return to DL's bedroom, HT2 L noticed that KL had moved to the edge of the bed closest to the appellant. She was sitting on the bed with her legs spread and her feet dangling partially from the bed. In contrast, DL remained engrossed with his video game. The appellant was still on the floor next to the bed. However, he had shifted his position so that his knees remained pointed at the television while his torso was twisted back towards KL and the bed. The appellant was positioned between KL's spread legs and KL's T-shirt was raised above her belly button, with the appellant apparently looking at KL's underwear-covered vaginal area.

Although HT2 L's view of the appellant's actual conduct was obstructed by the appellant himself, HT2 L was able to discern that the appellant was well within reach of KL's vaginal area. Upon HT2 L's entry into the bedroom, the appellant leapt to his feet and seated himself in a chair. HT2 L described the appellant's conduct at that moment as fidgety and noted that the appellant did not appear to know what to do with his hands. Apparently the appellant would cross his arms over his chest one second and then stuff his hands in his pockets the next.

Two or three minutes later, the appellant left the room, leaving HT2 L and the children alone. By this time, the Family Support Group meeting had concluded and Mrs. L was on the patio smoking a cigarette with the appellant's wife. The appellant came outside and told his wife to hurry because they had to leave. Mrs. L also remembers the appellant saying something to the effect that he had to leave because of work concerns. The appellant, with his wife in tow, departed the premises without saying goodbye to Mrs. L.

After the appellant left the room, HT2 L asked KL why she had been sitting on the bed with her legs spread. Not getting a response, HT2 L carried the girl downstairs. Once again, HT2 L asked KL why she had been sitting in the position mentioned above and then asked if the appellant had touched her. In response, KL raised her shirt, pulled down her underwear, and said, "He touched me here" as she pointed towards her vaginal area. Record at 59.

HT2 L immediately located his wife on the patio and told her what KL had just said. Mrs. L approached KL and asked if the appellant had touched her. Once again, KL lifted her shirt, pulled down her underwear, and said "He touched me here," indicating her vaginal area. *Id.* at 61. At trial, the military judge admitted KL's statements to her parents under the residual exception to the hearsay rule.

By the time security personnel arrived at the home, KL was fast asleep. The next morning, the girl was taken to a hospital for an examination. The registered nurse who conducted the examination was recognized by the military judge as an expert in the field of child sexual abuse. The nurse testified that she examined KL in various positions with various aids, including a purple fluorescent light used to check for bodily secretions and small injuries. Although the examination did not reveal the presence of DNA belonging to the appellant, KL had suffered a penetrating blunt force trauma to her vaginal area consistent with sexual assault. These injuries had been sustained within the 18–24 hours preceding the examination. A second medical expert in child development and child abuse reviewed the records pertaining to this examination and concurred in the opinion that KL's injuries could have been caused by a sexual assault, but could not say for sure if that was the case.

### Evidentiary Rulings

The appellant presses two assignments of error involving evidentiary rulings by the military judge.[1] In his first assignment of error, the appellant argues that the military judge abused his discretion by admitting the testimony of two witnesses who described prior, uncharged acts of child molestation committed by the appellant. The appellant's third assignment of error challenges the military judge's admission of KL's statements under the residual hearsay exception.

This court reviews a military judge's admissibility determinations for abuse of discretion. *United States v. Dewrell,* 55 M.J. 131, 137 (C.A.A.F.2001). This is a strict standard requiring more than a mere difference of opinion. *United States v. McElhaney,* 54 M.J. 120, 130 (C.A.A.F.2000). In short, a military judge's admission of evidence will be reversed only when his actions are "arbitrary, fanciful, clearly unreasonable," or "clearly erroneous." *United States v. Miller,* 46 M.J. 63, 65 (C.A.A.F.1997)(quoting *United States v. Travers,* 25 M.J. 61, 62 (C.M.A.1987)).

---

1. For clarity's sake, we will regroup the appellant's assignments of error and address them out of order.

## A. Prior, Uncharged Acts Of Child Molestation

Over defense objections, the military judge admitted the testimony of two prosecution witnesses who claimed the appellant had sexually molested them when they were children. The first witness, Ms. H, a 26–year–old civilian, testified that from the time she was seven until she reached the age of 10, the appellant dated her sister. During his visits to her home, the appellant made a regular habit of finding Ms. H alone and using his fingers to penetrate her vagina. Over the course of 3 years, between 1983 and 1985, this conduct occurred on as many as 50 occasions.

The second witness, Ms. M, also a civilian, testified that the appellant sexually molested her in 1983 when she, as an eight-year-old, visited the home of a relative of her babysitter. In this instance, the appellant approached Ms. M from behind and fondled her vaginal area for a period of 5 minutes both above and below her underwear. The second and third incidents occurred when Ms. M awoke to find the appellant fondling her vagina with his fingers.

■ MILITARY RULE OF EVIDENCE 414(a), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.), allows for the admission and consideration of prior, uncharged instances of child molestation in any court-martial where the accused is charged with child molestation. This rule and its companion rule involving sexual assaults committed against adults, MIL. R. EVID. 413, represent exceptions to the long-standing bar against the admission of propensity evidence. *See* MIL. R. EVID. 404(b); *see also United States v. Wright,* 53 M.J. 476, 480 (C.A.A.F.2000)(discussing MIL. R. EVID. 413); *United States v. McDonald,* 53 M.J. 593, 595 (N.M.Ct.Crim.App.2000)(addressing MIL. R. EVID. 414), *aff'd,* 55 M.J. 173 (C.A.A.F.2001). These rules are intended to assist the finder of fact in assessing credibility in sexual assault and child molestation cases, and to assess the accused's criminal propensities in light of past conduct. *United States v. Myers,* 51 M.J. 570, 580 n. 19 (N.M.Ct.Crim. App.1999); *see also United States v. Enjady,* 134 F.3d 1427, 1431 (10th Cir.1998).

■ The appellant does not contest that he was charged with an offense falling within the definition of child molestation. Nor does he contest that the testimony of both of the prosecution witnesses alleged prior, uncharged incidents of child molestation. Likewise, the appellant has not disputed fair notice of the prosecution's intent to offer this evidence in his case. In fact, the appellant does not even challenge this evidence on relevance grounds. *See Myers,* 51 M.J. at 580–81 (outlining the hurdles the Government must clear before presenting MIL. R. EVID. 413 and 414 evidence to a court-martial). Instead, the appellant narrows his argument to focus exclusively on whether the probative nature of this evidence was substantially outweighed by the danger of unfair prejudice. MIL. R. EVID. 403; *see McDonald,* 53 M.J. at 595 (requiring a MIL. R. EVID. 403 balancing test to be conducted prior to the admission of MIL. R. EVID. 414 evidence); *Myers,* 51 M.J. at 581.

As explained by the military judge, the testimony of both Ms. H and Ms. M clearly established the appellant's propensity to engage in sexual conduct with prepubescent females by fondling their vaginal areas, particularly in situations where other adults were not present. The similarities between the incidents revealed by both Ms. H and Ms. M and the circumstances surrounding the appellant's contact with KL, as related by HT2 L, as well as the injuries to KL discovered by the Government's expert witness, were too strong to be ignored and, thus, certainly probative of the appellant's guilt. At the same time, the Government's MIL. R. EVID. 414 witnesses bore no outward motive to fabricate their individual testimony and withstood cross-examination by the appellant's civilian trial defense counsel.

Keeping in mind that the appellant was tried by a military judge, who is presumed to know and follow the law, see *United States v. Prevatte,* 40 M.J. 396, 398 (C.M.A.1994), we do not see how the risk of unfair prejudice could have substantially outweighed the probative value of the propensity evidence offered by the Government. Consequently, we

deny the appellant's first assignment of error.

## B. The Residual Exception to the Hearsay Rule

We now turn to the appellant's third assignment of error, in which he challenges the military judge's admission of residual hearsay under MIL. R. EVID. 807. When this matter came to trial, KL was only three years old and, thus, under MIL. R. EVID. 601, determined to be incompetent to testify. The prosecution instead offered the testimony of both HT2 L and Mrs. L concerning the statements KL made to them as hearsay admissible under the MIL. R. EVID. 807 residual exception.

We begin our analysis by confirming that the statements offered qualify as hearsay. There can be no dispute that KL's statements were made out of court and, due to her absence as an incompetent, were repeated in court by her testifying parents. Furthermore, there is no doubt that the Government offered KL's statements for the truth of the matter asserted. Thus, these statements meet the definition of hearsay and their admissibility depended on the hearsay exceptions provided for in the Military Rules of Evidence. MIL. R. EVID. 801(c); *see United States v. Taylor*, 61 M.J. 157, 159 (C.A.A.F.2005).

 In *United States v. Giambra*, 33 M.J. 331, 334 (C.M.A.1991), our superior court stated that for a hearsay statement to be admissible under the residual exception to the hearsay rule it must have equivalent circumstantial guarantees of trustworthiness commensurate with the other exceptions to the hearsay rule. *See also Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)(applying the long-standing requirement that out of court statements are admissible if they fall within a firmly rooted hearsay exception or otherwise bear "adequate 'indicia of reliability'" (citation omitted)). In testing whether a statement is

supported by such guarantees of trustworthiness, a military judge or this court will look to all manner of reliability indicators including, but not limited to: (1) the mental state and age of the declarant; (2) the spontaneity of the statement; (3) the use of suggestive questioning; and (4) whether the statement can be corroborated. *United States v. Donaldson*, 58 M.J. 477, 488 (C.A.A.F.2003); *United States v. Kelley*, 45 M.J. 275, 281 (C.A.A.F.1996); *United States v. Grant*, 42 M.J. 340, 343–44 (C.A.A.F.1995).[2] With respect to the weighing of these considerations we must acknowledge and respect the military judge's considerable discretion. *Donaldson*, 58 M.J. at 488.

 In this case, we agree with the military judge that although HT2 L and Mrs. L were naturally upset when they questioned KL, there was no evidence that the parents' inquiries were posed in a suggestive manner. We do not find that two-year-old KL had a motive to fabricate her statement. Nor do we find that the child's parents acted with a sinister motive. Furthermore, the spontaneity of KL's statements coupled with the repeated, unnatural actions of adjusting her clothing to illustrate exactly where she was touched by the appellant were strong indicators of trustworthiness. *Donaldson*, 58 M.J. at 488–89 (accepting an identical conclusion in a case involving a three-year-old victim who, like KL, moved her undergarments to the side to make clear where she had been violated). Finally, the expert testimony offered by the Government explaining the injuries to the girl's vaginal area corroborated KL's hearsay statements.

The extrajudicial statements at issue certainly met the necessary circumstantial guarantees of trustworthiness for admission as hearsay under MIL. R. EVID. 807. For the same reasons, we are also satisfied that the evidence carries the particularized guarantees of trustworthiness required to meet the *Roberts* standard. *See Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. At the end of the day,

---

**2.** When applying the *Roberts* standard to cases involving child witnesses, the Supreme Court specified the following factors as relevant to the issue of trustworthiness: (1) spontaneity and consistent repetition; (2) mental state of the declarant; (3) use of terminology unexpected of a child of similar age; and (4) lack of motive to fabricate. *Idaho v. Wright*, 497 U.S. 805, 821, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

the appellant has failed to demonstrate that the military judge abused his considerable discretion by receiving KLs out-of-court statements into evidence.[3]

### Crawford v. Washington

Determining that the statements in question qualify as admissible hearsay does not end our inquiry. After the appellant's court-martial, but prior to our consideration of this case, the United States Supreme Court decided *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which overturned a Washington state court's admission of out-of-court statements made by the defendant's wife, who was unavailable to testify at trial. The Supreme Court decried the admission of the wife's statements because, despite the fact that the statements fell within a state approved hearsay exception, their admission ran afoul of the Confrontation Clause of the Sixth Amendment to the United States Constitution. *Id.* at 62–63, 124 S.Ct. 1354. Realizing that similar concerns arose by virtue of the military judge having admitted KL's out-of-court statements to her parents, we invited both the appellant and the Government to submit supplemental briefs addressing the impact, if any, of the *Crawford* decision on this appeal.

The defendant in *Crawford* was tried for assault and attempted murder. The prosecution offered statements made by Crawford's wife during her own interrogation by the police as evidence that Crawford was not acting in self-defense when he attacked an individual named Lee. *Id.* at 40, 124 S.Ct. 1354. The wife was unavailable to testify at trial because of the state marital privilege. However, Washington state law prevented the marital privilege from extending to a spouse's out-of-court statements that were admissible under a hearsay exception. *See State v. Burden,* 120 Wash.2d 371, 841 P.2d 758, 761 (1992). Since the wife had facilitated the attack by leading her husband to Lee, the prosecution successfully offered the wife's extrajudicial statement under the exception to the hearsay rule reserved for

statements against penal interest. *Crawford,* 541 U.S. at 40, 124 S.Ct. 1354; WASHINGTON RULE OF EVIDENCE 804(b)(3).

Crawford challenged his conviction claiming that the admission of his wife's extrajudicial statements violated his right to be confronted with the witnesses against him. As mentioned earlier, prior Supreme Court decisions had limited that right by permitting the use of out-of-court statements where the declarant was unavailable and the statement bore "adequate 'indicia of reliability.' " *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531 (citation omitted). The *Roberts* standard requires the evidence to either fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." *Id.*

After conducting an exhaustive analysis with respect to the historical underpinnings of the Confrontation Clause, the Supreme Court determined that the Framers' intent was not served by permitting the admission of out-of-court "testimonial" statements where the defendant was unable to cross-examine the declarant. *Crawford,* 541 U.S. at 51–55, 124 S.Ct. 1354. In reaching this conclusion, the Supreme Court made clear that the protections afforded by the Sixth Amendment's Confrontation Clause extend beyond in-court testimony to reach out-of-court statements. The Supreme Court's ruling ensures that the guarantee of confrontation will not wither in the face of the ever-developing law of evidence, but rather, retain its status as the unyielding breakwater against which a tragic history of inquisitorial practices had been obliterated. *Id.* at 51–52, 124 S.Ct. 1354.

In light of its findings, the Supreme Court determined that the *Roberts* conditions for admissibility of hearsay evidence departed from the original understanding of the Confrontation Clause. *Id.* at 60, 100 S.Ct. 2531. By simply inquiring as to whether the statement offered falls within a "firmly rooted hearsay exception" or otherwise bears "particularized guarantees of trustworthiness," see *id.* at 66, 100 S.Ct. 2531, the *Roberts*

---

**3.** We further hold that KL's out-of-court statements could have been admitted as present sense impressions under MIL. R. EVID. 803(2)(defining a present sense impression as a "statement de-

scribing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter").

standard creates a situation where hearsay evidence is evaluated without any concern for the actual nature of the statement, and without any analysis of whether the nature of the statement triggers the protections afforded by the Confrontation Clause.

In essence, the *Roberts* standard is too broad in some instances, by encouraging close constitutional scrutiny when none is needed, and too narrow in others, by permitting the admission of constitutionally suspect evidence based on nothing more than a mere finding of reliability. *Id.* at 60, 100 S.Ct. 2531; *Bockting v. Bayer,* 399 F.3d 1010, 1025 (9th Cir.2005)(Wallace, J., concurring and dissenting). As a result, the *Crawford* court determined that testimonial out-of-court statements may not be admitted against a defendant unless the defendant has actually cross-examined the declarant, irrespective of whether the statement falls within a firmly rooted hearsay exception or bears particularized guarantees of trustworthiness. *Crawford,* 541 U.S. at 69, 124 S.Ct. 1354; *United States v. Hall,* 419 F.3d 980 (9th Cir.2005); *United States v. Holmes,* 406 F.3d 337, 347–48 (5th Cir.2005).

Nevertheless, the *Crawford* holding does have its limits. The Supreme Court expended considerable effort making clear that not all hearsay statements implicate the Sixth Amendment's "core concerns." *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354; *see United States v. Lopez–Moreno,* 420 F.3d 420 (5th Cir.2005)(holding that the cross-examination strictures imposed by the *Crawford* decision only apply to testimonial hearsay statements). Looking to the wording of the Confrontation Clause itself, the Supreme Court determined that the passage applies to "witnesses," meaning those who "bear testimony," which in turn, involves a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354 (citation omitted). Such "testimonial" statements include in-court testimony as well as its functional equivalent, such as affidavits, custodial examinations, depositions, confessions, prior testimony that the defendant was unable to cross-examine, and similar pretrial statements. *Id.* at 51–52, 124 S.Ct. 1354 (quoting

*White v. Illinois,* 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992))(Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment).

The *Crawford* court specifically declined to provide a definition of what constitutes a testimonial statement. *Id.* at 68, 124 S.Ct. 1354. The Supreme Court did explain, however, that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* The Supreme Court expanded on this thumbnail sketch of testimonial statements by providing its observation that these "modern practices [bear the] closest kinship to the abuses at which the Confrontation Clause was directed." *Id.* The *Crawford* court also noted that, in perhaps the broadest sense, testimonial statements are those " 'made under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial.' " *Id.* at 52, 124 S.Ct. 1354 (quoting from the *amicus curiae* brief filed by the National Association of Criminal Defense Lawyers); *see also United States v. Manfre,* 368 F.3d 832, 838 n. 1 (8th Cir.2004)(describing these statements by the *Crawford* court as "bench marks").

Focusing on the out-of-court statement offered against Crawford, the Supreme Court explained that statements provided during police interrogations, while not under oath, bear a striking resemblance to the testimonial statements historically obtained by justices of the peace in England, which in part motivated the Framers to craft the Confrontation Clause in the first place. *Id.* at 53, 124 S.Ct. 1354. The involvement of Government officials vested with investigatory and prosecutorial powers in producing testimonial statements always presents a risk of abuse that must be counterbalanced by the certainty that such statements will be tested in the crucible of cross-examination. *Id.* at 53, 55 n. 7, 61, 124 S.Ct. 1354. Hence, the testimonial nature of the statements Crawford's wife made during her own police interrogation triggered the guarantee of confrontation when offered against Crawford. The resulting absence of cross-examination barred the

admission of the evidence regardless of whether it fell within a traditional hearsay exception or was otherwise deemed reliable. *Id.* at 59, 124 S.Ct. 1354.

■ Therefore, we must determine whether KL's out-of-court statements to her parents qualify as testimonial hearsay. If so, then the *Crawford* decision mandates exclusion because the appellant was deprived of his right to confront a witness against him. On the other hand, if KL's statements are nontestimonial, then our earlier determination that her statements qualify as admissible hearsay under *Roberts* will stand. *See Crawford,* 541 U.S. at 68, 124 S.Ct. 1354 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law...."); *United States v. Hendricks,* 395 F.3d 173, 179 (3d Cir.2005).

KL's statements to her parents neither fall within, nor are analogous to, any of the specific examples of out of court testimonial statements outlined by the *Crawford* Court. At the same time, the circumstances under which this two-year-old declarant made her statements would not lead an objective witness to reasonably believe that the statements would be available for use at a later trial. Two-year-old KL could no more appreciate the possible future uses of her statements than she could understand the significance of what she was communicating. Furthermore, we do not find that HT2 L and Mrs. L questioned KL under circumstances that would have led a reasonable witness to foresee the possibility of the responses being used during a future trial. Unlike depositions, affidavits, police interrogations, and the like, the motivation behind HT2 L and Mrs. L's questioning of KL was not to procure and preserve a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." *See Crawford,* 541 U.S. at 51, 124 S.Ct. 1354. Nor were the statements the product of a situation bearing any sort of "kinship to the abuses at which the Confrontation Clause was directed." *Id.* at 68, 124 S.Ct. 1354. On the contrary, the questions that resulted in KL's extrajudicial statements were posed out of nothing more than the normal and expected parental instinct to protect their cherished offspring.[4]

We find that KL's out-of-court statements to her parents are nontestimonial. The strictures of the *Crawford* decision do not apply to the case at bar and, thus, our determination that the child's statements were admissible under the Supreme Court's decision in *Roberts* and the Military Rules of Evidence stands.[5]

---

4. The facts of this case bear no resemblance whatsoever to those post-*Crawford* cases in which the Federal courts have found "testimonial hearsay." *See, e.g., United States v. Gilbert,* 391 F.3d 882, 884 (7th Cir.2004)(concluding that statements made by the defendant's wife during recorded telephone conversations with police officers were testimonial); *United States v. Rodriguez–Marrero,* 390 F.3d 1, 17 (1st Cir.2004)(finding a signed confession given under oath to a prosecutor in Puerto Rico to be testimonial hearsay), *cert. denied,* 544 U.S. 912, 125 S.Ct. 1620, 161 L.Ed.2d 292 (2005); *United States v. Cromer,* 389 F.3d 662, 675 (6th Cir.2004)(holding that a statement made knowingly to the authorities that describes criminal activity is almost always testimonial); *United States v. Bruno,* 383 F.3d 65, 78 (2d Cir.2004)(stating that plea allocution transcript and grand jury testimony of unavailable witnesses constituted testimonial hearsay); *but see Parle v. Runnels,* 387 F.3d 1030, 1037 (9th Cir.2004)(suggesting, in dicta that statements contained in diary constituted nontestimonial hearsay), *cert. denied,* 544 U.S. 1041, 125 S.Ct. 2274, 161 L.Ed.2d 1073 (2005).

5. The *Crawford* Court made clear that it was abolishing the *Roberts* standard with respect to testimonial hearsay. However, the Court made it equally clear that it was refusing to do away with the *Roberts* test as it applies to nontestimonial hearsay. 541 U.S. at 61, 124 S.Ct. 1354; *see also White,* 502 U.S. at 366, 112 S.Ct. 736 (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment)(rejecting a call to apply the Confrontation Clause to testimonial statements exclusively). Although the Supreme Court has acknowledged that hearsay rules and the Confrontation Clause are intended to protect similar values, the Supreme Court has been careful in preserving the supremacy of the constitutional guarantee over statutory and regulatory-based rules of evidence. *See California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). In light of the *Crawford* court's refusal to abandon *Roberts* altogether, we are constrained to acknowledge that the Confrontation Clause may still bar the admission of nontestimonial hearsay evidence that would otherwise be admissible under an exception to the general prohibition against receiving out-of-court statements offered for the truth of the matter assert-

### Sufficiency of the Evidence

■ The appellant's fourth assignment of error challenges the factual and legal sufficiency of the evidence used to convict him at trial. By statute, we are charged with determining both the legal and factual sufficiency of the evidence presented at trial. Art. 66(c), UCMJ; *see United States v. Turner*, 25 M.J. 324, 324–25 (C.M.A.1987). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *Turner*, 25 M.J. at 324 (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). In contrast, the factual sufficiency test is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the [reviewing court] are themselves convinced of the accused's guilt beyond a reasonable doubt." *Id.* at 325. In making these determinations, we are mindful that reasonable doubt does not mean the evidence must be free of conflict. *United States v. Reed*, 51 M.J. 559, 562 (N.M.Ct.Crim.App.1999)(citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R.1986)), *aff'd*, 54 M.J. 37 (C.A.A.F.2000). Furthermore, as " 'factfinders [this court] may believe one part of a witness' testimony and disbelieve another.' " *United States v. Lepresti*, 52 M.J. 644, 648 (N.M.Ct.Crim.App.1999)(quoting *United States v. Harris*, 8 M.J. 52, 59 (C.M.A.1979)).

The elements of committing an indecent act with a child are as follows:

(1) that the accused committed a certain act upon the body of a certain person;

(2) that the person was under 16 years of age and not the spouse of the accused;

(3) that the act was indecent;

(4) that the accused acted with the intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of the accused, the victim, or both; and

(5) that the conduct was to the prejudice of good order and discipline in the armed ed. *See Wright*, 497 U.S. at 814, 110 S.Ct. 3139.

forces or was of a nature to bring discredit upon the armed forces.

MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.), Part IV, ¶ 87b(1)(a)-(e).

HT2 L testified concerning the appellant's unsupervised access to KL on the night of 8 September 1999. HT2 L further recounted his observations of the appellant sitting between KL's spread legs and the attention he was apparently paying to the young girl's vaginal area. When interrupted, the appellant began acting peculiarly and, as testified to by both HT2 L and Mrs. L, made a hasty departure from the house.

Added to this testimony were the statements and actions of KL to the effect that the appellant had touched her vaginal area. KL's hearsay statements were sufficiently corroborated by expert medical testimony, as well as evidence that the appellant had engaged in virtually identical conduct with two other very young girls on more than 50 other occasions. After considering the evidence in the light most favorable to the prosecution, and making the necessary allowances, we hold that a reasonable fact finder could have found all the essential elements beyond a reasonable doubt and we too are convinced of the appellant's guilt beyond a reasonable doubt. Therefore, we decline to grant relief.

### Effective Assistance Of Counsel

The appellant's second assignment of error alleges that he was prejudiced by the deficient performance of his civilian defense counsel during trial. With respect to ineffective assistance of counsel claims, the military courts apply the standard handed down by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *United States v. Scott*, 24 M.J. 186, 187 (C.M.A.1987).

First, the appellant must show that his counsel's performance was deficient. In attempting to do so, the appellant must surmount a very high hurdle by overcoming a strong presumption that counsel performed competently. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *United States v. Russell*, 48 M.J. 139, 140 (C.A.A.F.1998)(citing *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052). More-However, this is not such a case.

over, the appellant must show that the alleged acts or omissions by former counsel fell outside the broad range of reasonable conduct afforded attorneys. *Dewrell,* 55 M.J. at 133.

Second, the appellant must establish that the deficiency prejudiced his defense. Specifically, he must show that counsel's shortcomings were so serious as to deprive the appellant of a fair trial with reliable results. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. In addressing this portion of the analysis, our superior court has held that the test for prejudice is whether there is a reasonable probability that, absent the ineffective assistance, the trier of fact would have had reasonable doubt with respect to the appellant's guilt. *Scott,* 24 M.J. at 189 (quoting *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052).

 The appellant contends that his former civilian trial defense counsel failed him by not investigating the character of both Ms. H and Ms. M, who provided the prior, uncharged child molestation evidence outlined above. The appellant further faults his former civilian trial defense counsel for not procuring any medical or social services records pertaining to these witnesses. We agree with the appellant that a trial defense counsel has a duty to perform a reasonable investigation or make a determination that a particular avenue of research is unnecessary. *United States v. Sales,* 56 M.J. 255, 258 (C.A.A.F.2002)(citing *United States v. Brownfield,* 52 M.J. 40, 42 (C.A.A.F.1999)). However, we will not review a trial defense counsel's decision to follow a particular strategy on whether it ultimately proved successful. Instead, we confine our inquiry to whether former trial defense counsel made reasonable choices in strategy from among the alternatives available at trial. *Dewrell,* 55 M.J. at 136 (quoting *United States v. Hughes,* 48 M.J. 700, 718 (A.F.Ct.Crim.App. 1998)).

We begin by noting that the appellant's assertion of deficient performance stems purely from his post-trial affidavit, in which he fails to raise specific allegations. Further, the record is devoid of any impartial evidence or statement from any former civilian or military trial defense counsel as to whether

investigations of Ms. H and Ms. M were ever conducted, or whether records concerning either witness were sought. Nor do we have any proof that such records exist; much less any idea what information these documents might contain and how such information could have benefited the defense.

 Nevertheless, even if we take the appellant's allegations at face value, we do not see a deficiency, much less a deficiency rising to the level of reversible prejudice. Ms. H testified that she does not have any medical reports pertaining to the 3–year period during which she endured dozens of sexual assaults committed by the appellant. Additionally, other than her sister, Ms. H never told anyone of the assaults, thus making the existence of social services or police records highly unlikely. As for Ms. M, she testified that although she told her father about the appellant's behavior, the authorities were never contacted. Again, even if the investigations the appellant claims should have been conducted had been carried out, the process would likely have yielded little, if any, useful information.

In light of the evidence in the record, we find the appellant has failed to carry his burden of establishing that his civilian trial defense counsel's performance fell below the standard expected of individuals in the legal profession. Therefore, we decline to grant relief.

### Post–Trial Representation

In his fifth assignment of error, the appellant claims that he was denied effective representation throughout the post-trial review process, because he and his trial defense counsel were supposedly at odds during much of the post-trial processing of his court-martial. We disagree.

 An accused is entitled to effective, conflict-free representation throughout the post-trial review process. *United States v. Wiley,* 47 M.J. 158, 159 (C.A.A.F.1997). Furthermore, when the staff judge advocate (SJA) is aware of a potential conflict between the accused and his defense counsel, the SJA should notify the defense counsel of the accused's dissatisfaction. *United States v. Cor-*

*nelious,* 41 M.J. 397, 398 (C.A.A.F.1995)(citing *United States v. Carter,* 40 M.J. 102, 105 (C.M.A.1994)). Once the defense counsel is notified, he bears the obligation of contacting his client and providing advice as to the consequences of terminating their attorney-client relationship, and ascertaining whether the accused is sincere in his desire to discharge the attorney or just expressing frustration. *Id.* at 398 (citing *United States v. Gray,* 39 M.J. 351 (C.M.A.1993)). If counsel is discharged, he must notify the appropriate authority that he is no longer acting on the accused's behalf. *Carter,* 40 M.J. at 105. On the other hand, if the attorney and the accused can resolve their differences, then representation may continue. *Id.*

On 8 December 2000, the SJA received a letter from the appellant dated 5 December 2000, which begins, "Since a military counsel no longer represents me...." Staff Judge Advocate's Recommendation (SJAR)(undated) at enclosure 4. An identical opening appears in a letter drafted 11 December 2000, which the SJA received on 28 December 2000. SJAR Addendum of 8 Jan 2001 at enclosure 2. Yet a third letter, dated 12 December 2000, questions how the trial defense counsel could continue to represent the appellant when said counsel had "not even called [the appellant] to get [his] input on [the] case[.]" *Id.* at enclosure 3. Finally, attached to this 12 December 2000 correspondence is a letter the appellant dispatched to his trial defense counsel on 3 December 2000, noting that trial defense counsel had informed the appellant that he was "no longer [the appellant's] defense attorney," and asking "WHO IS" representing the appellant? *Id.* (emphasis in original).

These letters raise the possibility that a substantial conflict between the appellant and his trial defense counsel occurred during the post-trial process. The fact that the trial defense counsel submitted a response to the SJAR and request for clemency on 14 December 2000 does not necessarily resolve the matter. *Id.* at enclosure 1. On the other hand, the addendum to the SJAR indicates that the SJA discussed the appellant's letters of 11 and 12 December 2000 with the trial defense counsel and trial counsel. Conspicu-

ously absent, however, is any evidence establishing that the trial defense counsel contacted the appellant to provide advice as to the consequences of terminating their attorney-client relationship, and to ascertain whether the accused was sincere in his dissatisfaction with trial defense counsel. *See Cornelious,* 41 M.J. at 398. Nor do we have any evidence indicating that the appellant and his counsel were able to resolve their differences. *See Carter,* 40 M.J. at 105. The very fact that the appellant is pressing this issue before the court suggests that no such accord was reached.

Based on these facts, we cannot say that the SJAR was served in accordance with the requirements of RULE FOR COURTS-MARTIAL 1106(f)(1), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.). Finding the post-trial processing of this case deficient, we now turn to the question of whether relief is appropriate. Furthermore, the answer to that question will turn on whether we can test the facts of this case for prejudice.

A collection of decisions from our superior court and this court offer guidance as to the standard to be applied when assessing the impact of post-trial errors involving SJARs. At one end of the spectrum is a narrow, straightforward holding that the failure to prepare an SJAR prior to the convening authority taking action renders a given court-martial substantially incomplete, and a second round of post-trial proceedings will be ordered without a showing of prejudice. *United States v. Mark,* 47 M.J. 99, 102 (C.A.A.F.1997). Coming next are cases where there is no question that the accused was left without the benefit of counsel to represent his interests by receiving and responding to the SJAR. The typical situation in this category is illustrated by *United States v. Hickok,* 45 M.J. 142 (C.A.A.F.1996), where the trial defense counsel left active duty and no substitute defense counsel was appointed. The resulting deprivation of assistance from counsel during a critical phase of the proceedings is " 'legally presumed to result in prejudice.' " *Id.* at 145 (quoting *United States v. Leaver,* 36 M.J. 133, 136 (C.M.A. 1992))(Gierke, J., concurring).

Occupying the much wider middle ground of the spectrum are varying factual patterns where service of the SJAR was made on a conflicted counsel, or counsel who had yet to form an attorney-client relationship with the appellant. While these cases also raised the specter that to some degree the appellant may have been both legally and factually without post-trial representation, the cases were nevertheless tested for prejudice. *See United States v. Miller*, 45 M.J. 149, 151 (C.A.A.F.1996) (testing for prejudice where, despite having served the SJAR on a counsel who had yet to form an attorney-client relationship with the appellant, the SJA "had every reason to believe that he had complied fully with his responsibility under R.C.M. 1106(f)(1)"); *Carter*, 40 M.J. at 105–06 (finding neither a conflict nor prejudice where, although the SJA knew of the appellant's dissatisfaction with his representative, the trial defense counsel carried out his duties without that knowledge); *Leaver*, 36 M.J. at 135–36 (finding prejudice where the appellant notified the SJA of a conflict with his trial defense counsel, who was eventually discharged only to be reappointed as the appellant's substitute defense counsel); *United States v. Siler*, 60 M.J 772, 774–76 (N.M.Ct.Crim.App.2004)(conducting a prejudice analysis where the SJA knew that the substitute defense counsel on whom he served the SJAR had not formed an attorney-client relationship with the appellant). The difference between these cases and *Hickok* lies in the fact that unlike the latter case, the former cases all involved the presence of counsel who had a legal responsibility to protect the appellant's post-trial interests. *See Hickok*, 45 M.J. at 145. In short, absent a complete deprivation of counsel, all errors relating to service of the SJAR on potentially conflicted counsel or counsel who have yet to form attorney-client relationships may be tested for prejudice.

Finally, at the far end of the spectrum, the fact patterns once again narrow. In *United States v. Lowe*, 58 M.J. 261 (C.A.A.F.2003), our superior court held that preparing an SJAR without serving it on any defense counsel did not raise concerns with respect to whether the appellant was represented, but rather, simply qualified as a procedural violation of R.C.M. 1106(f)(1) that could be tested for prejudice.

The case at bar, due to its unique facts, falls somewhere between *Carter* and *Miller*. As explained earlier, the apparent conflict between the appellant and his trial defense counsel leaves us with concerns as to whether the appellant was legally represented during the post-trial processing of his case. From a factual standpoint, however, there is ample proof of active representation by the trial defense counsel who accepted service of the record of trial as well as the SJAR and thereafter submitted a response to the SJAR and a request for clemency. At the same time, we have an SJA who notified the trial defense counsel of the appellant's dissatisfaction, yet served the addendum to the SJAR on that same counsel without first procuring assurances that the appellant and the counsel had resolved their differences. Stated another way, although we have a functioning attorney present who was by all outward appearances carrying out his legal duty to protect the appellant's interests, we do not have a defense counsel who is unaware of the potential conflict. Nor do we have an SJA who had "had every reason to believe that he had complied fully with his responsibility under R.C.M. 1106(f)(1)." *Miller*, 45 M.J. at 151.[6]

Although slightly distinguishable from all of the cases cited above, the appellant's factual situation nevertheless falls along the continuum at a point where prejudice is not presumed. *Siler*, 60 M.J. at 775. Thus, the burden falls on the appellant to satisfy a low threshold of making some colorable showing of possible prejudice. *Id.* at 777. As always in such cases, we will give the appellant the

---

**6.** We reiterate our holding in *Siler* that neither the SJA nor the CA has an obligation to make inquires concerning the health of the relationship between the accused and his trial defense counsel or substitute defense counsel. 60 M.J. at 776. Yet in those instances where such inquires are made, or evidence of a conflict otherwise comes to their attention, such information may not be ignored, and will continue to trigger the obligation imposed upon them by the *Cornelious* decision to take the outlined steps as a means of ensuring that the accused's interest are adequately protected. *Siler*, 60 M.J. at 776.

benefit of the doubt and not speculate as to what the convening authority would have done had different matters been brought to his attention. *Lowe,* 58 M.J. at 263.

We granted the appellant's motion asking us to accept his affidavit in support of this particular assignment of error. In this document, the appellant complains that his defense counsel failed to conduct background investigations of Ms. H and Ms. M, who provided the propensity evidence discussed above. Appellant's Affidavit of 30 Oct 2003. Absent from this affidavit is any explanation of the conflict the appellant supposedly had with his detailed defense counsel during the post-trial processing of his court-martial, much less any description of the material he would have presented to the convening authority but for the difficulties he experienced with counsel. Therefore, we find that the appellant has failed to make a colorable showing of possible prejudice and additional post-trial review is unnecessary. *Siler,* 60 M.J. at 776.

### Conclusion

Accordingly, we affirm the findings and the sentence, as approved by the convening authority.

Chief Judge DORMAN and Senior Judge RITTER concur.

Judge HARRIS participated in the decision of this case prior to detaching from the court.